IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. GRAVES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOHN W. GRAVES II, APPELLANT.

Filed July 29, 2025.    No. A-24-951.

Appeal from the District Court for Lancaster County: RYAN S. POST, Judge. Affirmed.

Joshua D. Barber, of Barber & Barber, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

John W. Graves II appeals from his plea-based convictions of child enticement (subsequent) and child abuse and the sentences imposed thereon. He contends that the sentences imposed are excessive and that his counsel was ineffective. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

In July 2024, the State charged Graves with two counts of child enticement (subsequent), Class IIA felonies, and two counts of child abuse, Class IIIA felonies. Pursuant to a plea agreement, Graves pled no contest to an amended information charging him with one count of child enticement (subsequent), a Class IIA felony, and 1 count of child abuse, a Class IIIA felony. The amended information alleged that the victims of child enticement were K.C.R., who was born in 2018, and

- 1 -

K.C., who was born in February 2017. The amended information alleged that the victims of child abuse were K.C.R., K.C., B.W., and/or K.W.

For the charge of child enticement and child abuse of victims K.C.R. and K.C., the State provided the following factual basis: That shortly after dark on June 4, 2024, Graves, who was born in April 1981, entered the victims' residence while the mother was sleeping and convinced K.C.R. and K.C. to come with him to his residence by offering them the opportunity to play with Play-Doh. When the mother awoke the following day, she began walking towards Graves' house, which is located one block east of her home. On the way, she encountered Graves, who was carrying a lethargic K.C.R. in his arms. The mother contacted emergency services requesting medical attention and both K.C.R. and K.C. were transported to the hospital via ambulance due to the ingestion of an unknown substance.

During a later interview, the children explained that Graves was at their residence while their mother was sleeping, that Graves took them to his residence, and that Graves gave them toys and candy. K.C. stated that Graves locked the door so they could not escape and that K.C.R. was sleeping at Graves' residence with Graves lying next to K.C.R. and hugging her while she slept. K.C. further stated that K.C.R. found a striped, pink beverage cup or can in the yard along with some medicine which she ingested causing her to feel ill. The mother stated that she had never allowed her children to go to Graves' residence; Graves never babysat her children; and that she had never given Graves any idea, permission, or perception that she would allow him to remove any of the children from her home outside of her presence. The mother shared a text that she received following the incident in which Graves apologized for overstepping boundaries, vowed to never do it again, and stated that he hoped that she could forgive him. Graves was arrested on June 10 and, after waiving his *Miranda* rights, he admitted to escorting the victims to his residence on that night.

For the charge of child abuse of victims B.W. and K.W., the State provided the following factual basis: That on January 1, 2023, B.W., who was born in March 2011, disclosed to a school therapist that Graves, who was her mother's ex-boyfriend, had "touched her down there." During an interview, B.W. disclosed that while lying on the living room floor of Graves' residence, he touched her "top part" under her clothes, touched her leg and waistline over the clothes, and when he moved his hand toward her vagina, she pushed it away. This incident occurred between the end of summer of 2022 and no later than the winter of 2022.

B.W.'s older sister, K.W., who was born in May 2009, was also interviewed and disclosed that on several occasions at Graves' home, while she was sleeping or pretending to be asleep, Graves touched her bare breasts with his hand under her shirt, rubbed her buttocks with his hand on the outside of her clothing, and ran his hand on the inside of her waistband. The incidents occurred between the end of 2022 and the summer of 2023.

Additionally, both B.W. and K.W. reported that on several occasions, Graves tried to give them substances to dull their senses, including alcohol, cough syrup, melatonin, or other suspicious unknown substances, such as white pills. The children stated that sometimes they ingested the substances and sometimes they did not.

The court found Graves guilty of the charged offenses and following an enhancement hearing, determined that the child enticement charge was a subsequent offense.

At the sentencing hearing, the State asked the court to consider the serious nature of the offenses, noting that Graves, who had been a registered sex offender since 2018,

abducted the five and seven-year-old [victims] from their home in the evening while their mother was sleeping by offering them play-doh and candy.

He took them back to his home, locked the doors, they ate unidentified pill-formed special candy, and were drowsy and lethargic when returned to their mother who was frantic upon realizing they were still missing the next day.

One [victim] had to be carried and face[-]planted into the concrete when left to stand under her own weight. Both [victims] were taken to the hospital.

All of which is set against the backdrop of [Graves'] significant history of sex crimes. Between 2001 and 2008, he was charged with Sexual Misconduct of a Minor, Rape, Voyeurism, and Sex Assault between Indiana and Colorado.

In 2013, he was convicted of Child Enticement in Minden after he lured an 11-year-old into his home and fed her alcohol until she passed out. He got four to six years.

In 2022, he was contacted by an online watchdog group in Iowa posing as a teenager while he was on probation there locally.

And finally, Count II, here, between 2022 and [20]23, [Graves] sexually assaulted and groped both 11-year-old [B.W.] and 15-year-old [K.W.], including offering them suspicious substances like alcohol and melatonin to dull their senses.

Second, I'd ask you to consider the impact on the victims. Six-year-old [K.C.R.] has a scar on her face from concrete which serves as a constant reminder to her mother . . . of what happened.

Both [K.C.R.] and her sister [K.C.], whose victim impact statements are written in pencil, report being scared to this day. [B.W.] and [K.W.] report anxiety, depression, strained family relationships, mistrust of others, loss of self[-]worth, nightmares, and sleepless nights.

Lastly, I'd ask Your Honor to consider the danger [Graves] presents to the community not only through his conduct, but through his subsequent statements in the presentence investigation.

[Graves] contends he has "found God", and even uses words like repent. Repent is a sincere remorse for wrongs committed, that, if nothing else, begins with recognition of those wrongs.

Yet, with respect to [K.C.R. and K.C.], [Graves] cowardly fails to mention them at all. Instead, he recasts his present conduct simply as poor choices, unhealthy relationships, and "miscommunication", which borders between a gross understatement and an out and out lie.

In fact, [Graves] re-imagines several sexual relationships throughout his life, whether it was his ex-wife, who he was charged with raping, or a staff member at a group home that was initially reported as nonconsensual.

Because [Graves] takes no responsibility after decades of conduct, he presents a significant danger to the community and the State joins the [victims] in requesting a significant period of incarceration.

Defense counsel referred to a letter that he had written to the court setting forth errors in the presentence investigation report. He further noted that Graves actively participated in the prison ministry classes. Counsel noted that Graves would be subject to community supervision for the rest of his life and that Graves "has a number of psychological mental health diagnoses that will make, really, any sentence of imprisonment in the state prison system very difficult."

When given a chance for allocution, Graves stated that he was "remorseful," "very repentive," and recognized the long-term effects on the victims. He stated that he realized that there is a "life change" that he needed to make and that he has made it his "life goal to change."

The district court noted that it had reviewed the PSR including the additions; considered comments made by the State, defense counsel, and Graves; and considered the relevant statutory factors, along with the fact that Graves was age of 43, his 12th grade education, his "lengthy criminal history," and his mental health history. The court noted:

> Really, both counsel have addressed the issues that we have here, and I've considered those. And as you know, you have the prior Child Enticement, and I've considered that as well.
>
> I've considered just how absolutely scary this situation likely was for all of the victims and . . . their family, and the younger victims' mother.
>
> And I've had an opportunity to read through all of the statements and your statements and their statements, and I've considered all that information, and I've also considered that you are assessed as [a] very high risk to re-offend, and I can see why.
>
> And I think you recognize that, too, and what I hear you saying today is you're going . . to try your best to . . . start working on the things you need to work on, and I hope that you do, but for here, today, we're here on . . . two very serious charges, and there's consequences for those.
>
> Having considered all that information, and having regard for the nature and circumstances of the crimes, and [Graves'] history, character, and condition, I do find that imprisonment is necessary for the protection of the public because there is a substantial risk [that Graves] would engage in additional criminal conduct, during any period of probation, and lesser sentences would depreciate the seriousness of the crimes and promote disrespect for the law.

The district court sentenced Graves to 19 to 20 years' imprisonment for his child enticement (subsequent) conviction and 2 to 3 years' imprisonment for his child abuse conviction. The court ordered the sentences to be served consecutively to each other and any other sentence previously imposed on Graves and granted Graves credit for 189 days previously served. The court also determined that Graves was subject to the Nebraska Sex Offender Registration Act for his lifetime and was subject to lifetime community supervision. Graves has timely appealed and is represented by different counsel than represented him during his plea and sentencing.

### III. ASSIGNMENTS OF ERROR

Graves contends that (1) the sentences imposed are excessive and (2) his trial counsel was ineffective in (a) failing to interview and/or depose the mothers of the victims, failing to investigate the condition of the door lock on Graves' residence, and failing to investigate and obtain certain

video evidence and discuss that evidence with Graves, and (b) that the cumulative effect of the previously assigned errors deprived Graves of effective assistance of counsel.

## IV. STANDARD OF REVIEW

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Alkazahy*, 314 Neb. 406, 990 N.W.2d 740 (2023).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. EXCESSIVE SENTENCES

Graves first contends that the sentences imposed are excessive. Specifically, he argues that the court placed insufficient weight on his mental health history and mitigating evidence offered in his statements to the court and placed too much weight to the nature of the offenses. He also argues that the district court abused its discretion in considering the charges of voyeurism and trespassing in Indiana and sexual assault in Colorado as contained in the PSR as those should not have been included and the district court merely referred to those matters as "disagreements."

Graves was convicted of child enticement (subsequent), a Class IIA felony, and child abuse, a Class IIIA felony. See, Neb. Rev. Stat. § 28-311 (Reissue 2016) (criminal child enticement); Neb. Rev. Stat. § 28-707(1) and (4) (Cum. Supp. 2024) (child abuse). Graves' sentence of 19 to 20 years' imprisonment for child enticement (subsequent) is within the statutory sentencing range for Class IIA felonies which are punishable by a minimum of no imprisonment and a maximum of 20 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024) (felonies; classification of penalties). Graves' sentence of 2 to 3 years' imprisonment for child abuse is within the statutory sentencing range for Class IIIA felonies which are punishable by a minimum of no imprisonment and a maximum of 3 years' imprisonment and 9 to 18 months' post-release supervision, and/or a $10,000 fine. See § 28-105. The court properly imposed an indeterminate sentence pursuant to Neb. Rev. Stat. § 29-2204.02(4) (Reissue 2016) and no post-release supervision pursuant to § 28-105(6). Graves also received a substantial benefit from his plea agreement in which a count of child enticement (subsequent) and a count of child abuse were dismissed.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, as is the case here, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles, in determining the sentence to be imposed. *State v. Rivera-Meister*, 318 Neb. 164, 14 N.W.3d 1 (2024). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation

for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*.

We note that although Graves argues that the court placed insufficient weight on his mental health history and other mitigating evidence offered in his statements to the court and placed too much weight on the nature of the offenses, a sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

At the time of the presentence investigation report, Graves was 43 years old, divorced, with one child and no child support award reported. He graduated from high school. His criminal history included three convictions for second degree trespass; two convictions for disturbing the peace; and convictions for third degree domestic assault, criminal mischief ($500-$1,500), trespassing, third degree assault on an officer, third degree domestic assault with a prior, contempt of court, criminal child enticement, procuring alcohol for a minor, injuring/destroying property of another, obstructing a peace officer, and assault of an officer (bodily fluid). The charges that Graves contended were inaccurately included in his PSR, i.e., voyeurism and trespassing in Indiana in 2005 and sexual assault in Colorado in 2005 and 2008, were all listed as dismissed. The district court acknowledged Graves "disagreement" that those dismissed charges should not be considered or included in the PSR. Graves had previously been sentenced to probation but had never successfully completed it; he was either unsatisfactorily released or his probation was revoked. The level of service/case management inventory assessed Graves as a very high risk to reoffend. The combination of the Vermont Assessment of Sex Offender Risk – 2 and the Sex Offender Treatment Intervention and Progress Scale gave a combined assessment of Graves as a high risk to reoffend. The PSR indicated that Graves has been diagnosed with "persistent depressive disorder, agoraphobia with panic attacks, personality disorder with schizotypal and depressive traits, autism, bipolar disorder, AD/HD, and psychomotor retardation" and developmental problems due to a traumatic brain injury.

Although Graves states that he is remorseful, he has engaged in minimization and/or denial for the offenses related to K.C.R. and K.C. During the presentence investigation, Graves "expressed mixed feelings about the fairness of his charges," claiming that he was "protecting the victims (K.C.R. and K.C.) after they told him they felt unsafe at home . . . ," and alleged that the mother was engaged in criminal activities despite the fact that there was no evidence that the mother was involved in criminal activities. We also note that throughout the presentence investigation interview, Graves spoke about only two of the four victims involved (K.C.R. and K.C.) but did not mention B.W. and K.W. and did not take any responsibility regarding the offenses related to them.

The victim impact statements completed by K.C.R. and K.C. were completed in pencil and indicated that they were sad, mad, and scared. Both victims indicated that Graves should receive jail time and should not be allowed around children. B.W.'s victim impact statement expressed that, because of Graves' abuse, she suffers from anxiety and depression and her relationships with her friends and family have suffered. She stated that she has sleeping issues including having nightmares on a regular basis and that she has to have her bedroom locked when she sleeps because

she never feels safe. K.W.'s victim statement expressed that she has difficulty trusting others and that the abuse has "really affected my life."

In sum, based upon factors including that the sentences imposed are within the relevant statutory sentencing ranges; Graves' criminal history, which included similar offenses against children not including the charges that were dismissed; his prior failures at probation; the benefit that he received from his plea agreement; the nature of the offenses; the emotional harm suffered by the victims; and his failure to take responsibility for the offenses and/or attempts to mitigate his role in the offenses, the sentences imposed were not an abuse of discretion. This assignment of error fails.

## 2. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Graves next assigns as error that his trial counsel was ineffective in disregarding his requests to interview B.W. and K.W.'s mother regarding inconsistent statements by her daughters, to interview or depose K.C.R. and K.C.'s mother, to investigate the condition of the lock on the door of Graves' residence, and to investigate and obtain certain video evidence and to discuss that evidence with Graves. He also contends that the cumulative effect of the previously assigned errors deprived Graves of effective assistance of counsel.

Recently, in *State v. Swartz*, 318 Neb. 553, 566-67, 17 N.W.3d 174, 184-85 (2025), the Nebraska Supreme Court reiterated the propositions of law relative to a defendant's claims of ineffective assistance of counsel made in a direct appeal:

> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Rezac*[, 318 Neb.] 352, 15 N.W.3d 705 (2025).

> Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*[,466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d. 674 (1984)], the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Dat*[, 318 Neb.] 311, 15 N.W.3d 410 (2025). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

> An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.*

> Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the

appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

(a) Failure to Interview Mothers of Victims,
Failure to Investigate Condition of Door Lock,
and Failure to Obtain Video Evidence

Graves first alleges that his trial counsel was ineffective in disregarding his requests to interview the mothers of the victims, to investigate the condition of the lock on his door, and to investigate and obtain certain video evidence and discuss that evidence with him. More specifically, he claims that counsel failed to interview B.W. and K.W.'s mother regarding inconsistent statements by her daughters and failed to interview or depose K.C.R. and K.C.'s mother. He also contends that his trial counsel was ineffective in failing to investigate the condition of the lock on the door of Graves' residence and in failing to investigate and obtain certain video evidence and not discussing that evidence with Graves.

But notwithstanding these claims of ineffective assistance governing instructions he allegedly made to counsel governing the facts that led to the charges against him, Graves heard the factual bases provided by the State at the plea hearing regarding the charged offenses and accepted the factual bases as true. Further, during the plea hearing, the following exchange occurred between the district court and Graves:

THE COURT: . . . Have you told your attorney everything you know about this case?

[Graves:] I believe so, yes.

THE COURT: Are you aware of anything that could help you in your case that you've not discussed with your lawyer?

[Graves:] I believe I've mentioned everything I can at this point.

THE COURT: Are you satisfied with the job he's done for you in this case?

[Graves:] Yeah, . . . He's a very good attorney. He's a very good person. Thank you.

THE COURT: All right. So, you believe he is a competent lawyer and knows what he's doing?

[Graves:] He knows what he's doing, yes. . . .

THE COURT: Has he refused or neglected to do anything you've asked of him?

[Graves:] No.

THE COURT: Have you had enough time to talk with your lawyer about this case?

[Graves:] I believe I have. We have a few more things to go over that we discussed in the near future, but yes, I've –

THE COURT: And just to be clear – and I don't want you to tell me what you and your attorney talked about.

[Graves:] Right.

THE COURT: But are those things related to sentencing?

[Graves:] Yes.

THE COURT: Okay. So, they're not about your plea here today?

[Graves:] Right.

THE COURT: Okay.

[Graves:] Thank you for asking.

THE COURT: Before we go any further, do you need any more time to talk with him about anything else today?

[Graves:] I think we're good. Thank you.

In *State v. Chairez*, 302 Neb. 731, 924 N.W.2d 725 (2019), the defendant made a similar claim of ineffective assistance of counsel following his conviction in that, despite his requests, his trial counsel failed to collect evidence and interview exculpatory witnesses. But in rejecting that claim, the Nebraska Supreme Court held:

> The record on appeal refutes this contention. As stated above, [the defendant] explicitly stated during his plea colloquy that he had told his attorney everything he knew about the cases, there was nothing that could help him in connection with the case that he had not shared with his attorney, he was satisfied with the job of his counsel, and there was nothing that [the defendant] asked him to do that counsel failed or refused to do. . . . Based on his admission that counsel did not neglect or refuse to do anything that [the defendant] asked of him, we must find that [the defendant] counsel was not ineffective, because based on [the defendant's] clear and unchallenged admissions in the record, his counsel's performance was not deficient as a matter of law.

*State v. Chairez*, 302 Neb. at 739, 924 N.W.2d at 731. Similarly, in *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013), the Nebraska Supreme Court held that when allegations of ineffective assistance of counsel are affirmatively refuted by a defendant's assurances to the sentencing court, there is no basis for relief. In this holding, the court cited to a prior opinion where it had stated:

> If the dialogue which is required between the court and the defendant . . . all done during the sanctity of a full and formal court proceeding, is to be impugned by a mere recantation made after the doors of the prison clang shut, we are wasting our time and that of the trial judges, making a mockery out of the arraignment process.

*Id.* at 118-19, 835 N.W.2d at 58 (citing *State v. Scholl*, 227 Neb. 572, 419 N.W.2d 137 (1988)).

We make a similar finding here. During the plea hearing, Graves expressly stated that he had informed his trial counsel of anything that could be helpful to his case, admitted that his trial counsel had not refused or neglected to do anything Graves had asked of him, said that he was satisfied with counsel's representation, and said he did not need any additional time to consult with counsel. Graves' statements during the plea hearing affirmatively refute his claims that his trial counsel disregarded his requests and failed to interview the mothers of the victims, failed to investigate the door lock, and failed to obtain video evidence. Because the record affirmatively refutes his claims that his counsel was ineffective, this assignment of error fails.

### (b) Cumulative Error

Graves' final claim is that the cumulative effect of the previously assigned errors deprived Graves of effective assistance of counsel. Having found that no error occurred regarding Graves' other ineffectiveness of trial counsel claims, there is no cumulative effect of error.

## VI. CONCLUSION

Having rejected Graves' claims that the sentences imposed were excessive and that his trial counsel was ineffective, we affirm his convictions and sentences.

AFFIRMED.